# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF KANSAS

**Teresa Rogers,**

    **Plaintiff,**

**v.**             **Case No. 12-CV-2116**

**Apria Healthcare, Inc. a/k/a**
**Apria Healthcare Group, Inc.,**

    **Defendants.**

## <u>MEMORANDUM & ORDER</u>

  Plaintiff Teresa Rogers filed this lawsuit against her former employer Apria Healthcare, Inc. ("Apria") asserting numerous claims of discrimination, harassment and retaliation arising out of her employment with and her separation from Apria. Plaintiff's claims are brought pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.; the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 et seq.; 42 U.S.C. § 1981; the Kansas Act Against Discrimination, K.S.A. § 44-1001 et seq.; and the Kansas Age Discrimination in Employment Act, K.S.A. § 44-1111 et seq. This matter is presently before the court on Apria's motion to dismiss and for summary judgment (doc. 34).[1] As explained below, the motion is granted.

---

[1] Apria's motion is styled only as a motion for summary judgment but that portion of the motion seeking summary judgment as a result of plaintiff's alleged failure to exhaust her administrative remedies is properly construed as a motion to dismiss for lack of jurisdiction. *See Shikles v. Sprint/United Management Co.*, 426 F.3d 1304, 1317–18 (10th Cir. 2005) (when a district court determines that it lacks subject matter jurisdiction over a case, the proper disposition of the case is the entry of an order dismissing the case rather than the entry of summary judgment).

## I.    Facts

The following facts are uncontroverted or related in the light most favorable to plaintiff as the nonmoving party.  Defendant Apria Healthcare, Inc. ("Apria") provides home medical equipment such as oxygen and respiratory systems, ambulatory aids and testing supplies in coordination with its clients' insurance providers.[2]  Apria hired plaintiff, an African-American female, as a Customer Service Specialist in its Fax Data Entry ("FDE") group in October 2009.  Plaintiff was 48 years of age at the time she was hired.  As a Customer Service Specialist in the FDE group, plaintiff was responsible for responding to telephone and fax inquiries and orders from referral sources and homecare patients as well as providing information on Apria's equipment, supplies and services.  Her starting pay rate was $13.50 per hour.  In December 2009, plaintiff began working at Apria's Overland Park, Kansas location on the Sprint Campus, which includes a large customer service center.  Plaintiff maintained her pay rate and her job title throughout her employment with Apria, which ended in March 2011.

By the summer of 2010, only 4 other employees were working in the FDE group with plaintiff:  Sarah Jenkins, Melody Kemper, Kelly Thompson and Peggy Dinkins.  Ms. Dinkins is African-American and similarly aged as plaintiff.  Mmes. Jenkins, Kemper and Thompson are Caucasian.  Mmes. Jenkins and Thompson are younger than plaintiff and Ms. Kemper is older than plaintiff.   The uncontroverted evidence demonstrates that Apria hired Ms.

---

[2] Despite the caption of the case, the parties have stipulated in the pretrial order that Apria Healthcare, Inc. and Apria Healthcare Group, Inc. are separate entities; that Apria Healthcare, Inc. is plaintiff's former employer; and that Apria Healthcare Group, Inc. is not a proper party to this lawsuit.  The court, then, dismisses with prejudice all claims against Apria Healthcare Group, Inc.

Thompson as a Customer Quality Specialist in the EDI group in February 2010.[3]   Apria contends that Ms. Thompson initially struggled with the job duties of that position such that Apria temporarily assigned Ms. Thompson to the FDE group in March 2010 so that she could learn Apria's customer service functions.  Ms. Thompson, then, was working in the FDE group during the summer and fall of 2010 as a "temporary" assignment until she was ready to return to the EDI group.

Much of plaintiff's lawsuit concerns Apria's favorable treatment of Ms. Thompson as compared to plaintiff.  After discovering Ms. Thompson's paycheck stub on the office copier, plaintiff discovered that Apria was paying Ms. Thompson approximately $16.00 per hour. Apria, at least according to plaintiff, did not enforce its attendance and leave policies with respect to Ms. Thompson's absences; permitted Ms. Thompson to consistently fail to achieve her productivity goals without consequence; and allowed Ms. Thompson to work a more favorable shift assignment.  Plaintiff also contends that she received less formal training than Ms. Thompson and that she and Ms. Dinkins, as the only African-American employees in the FDE group, were required to perform additional duties that other employees were not required to perform.  During this timeframe, plaintiff filed the first of several charges of discrimination with the EEOC and the Kansas Human Rights Commission.

In mid-November 2010, Apria announced that the functions of the FDE group would be sent off-shore to a third-party vendor in India.  In light of the decision to outsource the FDE group, plaintiff's job, as well as the jobs of all other employees in the FDE group, were scheduled for elimination.  Apria's stated goal, however, was to ensure that the FDE employees

---

[3] It appears that neither party has defined "EDI" in their respective submissions to the court.

obtain other jobs within the organization and, along those lines, it encouraged FDE employees to apply for open positions in other departments at the Sprint Campus location.   Over the next several months, plaintiff and the other FDE employees worked temporarily in other departments while seeking new permanent positions.  Plaintiff performed work in the Suspended Billing group during this time frame, while continuing to answer phones in the Customer Service area.

After plaintiff's FDE position was outsourced, plaintiff applied for 14 positions within Apria.  While she did not receive interviews or offers for any of the positions for which she specifically applied, she was asked to interview for a Customer Quality Specialist position in January 2011 and she received a follow-up interview in mid-February 2011.  Apria offered her that position on February 16, 2011, along with a wage increase to $14.98 per hour.  Dissatisfied with the pay rate, the assigned schedule of 10:00am to 7:00pm, and the fact that the position involved only "triage,"[4] plaintiff declined the offer and submitted her resignation on February 18, 2011.  Apria permitted her to continue her employment until March 25, 2011 in the event that plaintiff obtained an offer from any of the applications that remained pending.  Plaintiff did not obtain another position by March 25, 2011 and her employment ended on that date.

Additional facts will be provided as they relate to the specific arguments raised by the parties in their submissions.

II.     **Summary Judgment Standard**

_____

[4] The evidence reflects that "triaging" requires the employee to prioritize patient orders based on urgency and specific products ordered.

4

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In applying this standard, the court views the evidence and makes inferences in the light most favorable to the non-movant. *Kerber v. Qwest Group Life Ins. Plan*, 647 F.3d 950, 959 (10th Cir. 2011). A dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party" on the issue. *Id*. (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Although the court views the evidence and draws reasonable inferences therefrom in the light most favorable to the nonmoving party, the "nonmoving party must present more than a scintilla of evidence in favor of his position." *Id*. (quoting *Ford v. Pryor*, 552 F.3d 1174, 1177-78 (10th Cir. 2008)).

## III. Exhaustion of Remedies

As a threshold matter, Apria moves to dismiss certain claims as a result of plaintiff's alleged failure to exhaust her administrative remedies. Specifically, Apria contends that plaintiff failed to exhaust her administrative remedies with respect to any claim for harassment; any claim based on an alleged increase in workplace monitoring; any claim based on Apria's failure to permit plaintiff to rescind her resignation; any claim based on Apria's failure to rehire plaintiff following her resignation; and any claims based on the KAAD or the KADEA. In response, plaintiff concedes that she did not adequately exhaust her remedies with respect to any claim of harassment. The court, then, dismisses these claims for lack of subject matter jurisdiction. *Shikles v. Sprint/United Management Co*., 426 F.3d 1304, 1318 (10th Cir. 2005). Plaintiff urges that she has exhausted the other claims challenged by Apria.

Under both Title VII and the ADEA, a plaintiff must exhaust his or her administrative remedies before filing suit. *Id.* at 1317. Generally, a plaintiff must file a charge of discrimination with respect to each discrete instance of discrimination or retaliation. *Apsley v. Boeing Co.*, 691 F.3d 1184, 1210 (10th Cir. 2012). In determining whether a plaintiff has exhausted administrative remedies with respect to a specific claim, the court's inquiry is limited to the "scope of the administrative investigation that can reasonably be expected to follow from the discriminatory *acts* alleged in the administrative charge. In other words, the charge must contain facts concerning the discrimination and retaliatory actions underlying each claim." *Jones v. UPS, Inc.*, 502 F.3d 1176, 1186 (10th Cir. 2007).

In the administrative phase of this case, plaintiff made six separate filings concerning her claims. She filed two separate charges with the EEOC, dated September 2, 2010 and December 10, 2010, and an amended charge with the EEOC, dated March 23, 2011. She also filed two separate charges plus an amended charge with the Kansas Human Rights Commission focused solely on her KAAD and KADEA claims. Those charges were filed on October 1, 2010 and January 10, 2011 and the amendment was filed on September 2, 2011. The court, then, looks to these six filings in analyzing Apria's exhaustion argument.

## A. Increase in Workplace Monitoring

Plaintiff concedes that none of her six filings "specifically state that there was increased workplace monitoring." She contends, however, that such a claim is "reasonably related" to her claims that she was denied transfers and promotions because those denials were allegedly justified by scrutinizing her work activity through increased monitoring. This argument is

rejected and the claim clearly was not raised at the agency level. The "reasonably related" exception to administrative exhaustion is all but defunct now, but even at its height did not apply to acts or claims occurring prior to the filing of the charge of discrimination. *See Martinez v. Potter*, 347 F.3d 1208, 1210 (10th Cir. 2003) (citing *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002) (each discrete claim must be the subject of a charge)); *Welsh v. City of Shawnee*, 1999 WL 345597, at *3 (10th Cir. June 1, 1999) (claims falling within the reasonably related exception arise after filing of charge); *Simms v. Oklahoma ex rel. Dept. of Mental Health & Subs. Abuse Servs.*, 165 F.3d 1321, 1327-28 (10th Cir. 1999) (plaintiff did not qualify for reasonably related exception where claims were based on facts that occurred prior to the filing of his last charge). Any alleged increase in workplace monitoring necessarily occurred before plaintiff filed her post-resignation amended charges. Because there are no facts or allegations contained in any charge filed by plaintiff concerning workplace monitoring, the court lacks jurisdiction over the claim and it is dismissed.

## B. Rescinding of Resignation/Failure to Rehire

Plaintiff contends that she exhausted her administrative remedies with respect to her claims that Apria failed to permit her to rescind her resignation and failed to rehire her. She has not. Plaintiff resigned her employment on February 18, 2011 and she filed both an amended EEOC charge and an amended KHRC charge after that date. Those amended charges make no reference whatsoever to Apria's failure to permit plaintiff to rescind her resignation or Apria's failure to rehire plaintiff. While plaintiff once again relies on the "reasonably related" exception

to the exhaustion requirement, that exception is inapplicable for the reasons set forth in the preceding paragraph.

She further contends that the claim is exhausted because she wrote a letter to the EEOC explaining that Apria refused to permit plaintiff to rescind her resignation. This argument, too, fails. Assuming that plaintiff actually sent the letter that she references (there is no evidence that the letter was mailed or received), the letter in no way can be treated as a charge for purposes of exhaustion. *See Jones v. UPS, Inc*., 502 F.3d 1176, 1183-84 (10th Cir. 2007) (discussing circumstances in which documents other than a formal charge may be construed as a charge). Although undated, the letter appears to be plaintiff's response to the EEOC's "no probable cause" determination, as she purports to challenge the EEOC's findings in various respects, including the EEOC's finding that Apria's decision to outsource plaintiff's position affected everyone in her department. In response to that finding, plaintiff insists that she had been adversely affected because she attempted to apply for other positions but was told by Apria that her resignation could not be rescinded, a position that she believed was retaliatory. Regardless, the letter does not indicate any intent on plaintiff's part to activate the administrative process and cannot be considered an amendment to her prior charge because that charge, apparently, had already been dismissed by the EEOC. Worse yet, the letter is not signed under oath or affirmation. Suffice it to say, plaintiff has not demonstrated that the unverified, undated letter she purportedly sent to the EEOC constitutes a charge for purposes of the exhaustion requirement. *Id*. at 1183-84 (at a minimum, document must be verified to constitute a charge).

The court, then, grants Apria's motion to dismiss plaintiff's claims that Apria failed to permit plaintiff to rescind her resignation and failed to rehire plaintiff.

8

*C. Plaintiff's KAAD and KADEA Claims*

Apria next contends that plaintiff's KAAD and KADEA claims must be dismissed because she concedes that she never filed a petition for reconsideration of the agency's "no probable cause" determination and that the filing of such a petition is a prerequisite for administrative exhaustion. This court has previously concluded, after analyzing the issue in some detail and with particular emphasis on Judge Briscoe's (then a Kansas Courts of Appeals judge) opinion in *Mattox v. Department of Transportation*, 12 Kan. App. 2d 403, 405 (1987), that a plaintiff need not file a petition for reconsideration upon a "no probable cause" determination from the Kansas Human Rights Commission. *See Parsells v. Manhattan Radiology Group, LLP*, 255 F. Supp. 2d 1217, 1226-27 (D. Kan. 2003) (citing *Van Scoyk v. St. Mary's Assumption Parochial Sch.*, 224 Kan. 304 (1978) (upon the entry of a no probable cause finding, "the doors of the agency were closed" and plaintiffs were thereafter free to pursue the matter further by bringing an independent tort action in district court)). Apria has not addressed this court's *Parsells* decision or attempted to distinguish the Kansas authority cited by the court in that opinion. For the reasons stated by the court in *Parsells*, then, the court denies Apria's motion to dismiss plaintiff's KAAD and KADEA claims.


**IV.    Discrimination Claims**

In the pretrial order, plaintiff contends that she was subjected to numerous discriminatory "terms and conditions" of employment concerning her training; the amount of phone work and other job duties assigned to her; her assigned work schedules; the application and enforcement

of productivity goals; and the application of Apria's attendance and leave policies as compared to younger, Caucasian employees. She also asserts race- and age-based claims based on her rate of pay; Apria's failure to transfer or promote plaintiff; and forcing plaintiff's resignation (or, effectively, terminating plaintiff's employment).[5] As plaintiff has no direct evidence of discrimination, her claims are analyzed using the burden-shifting framework set forth in *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Daniels v. United Parcel Serv., Inc.,* 701 F.3d 620, 627 (10th Cir. 2012).[6] Under *McDonnell Douglas*, plaintiff has the initial burden of establishing a prima facie case of discrimination. *Id.* To set forth a prima facie case of discrimination, plaintiff must establish "(1) membership in a protected class and (2) an adverse employment action (3) that took place under circumstances giving rise to an inference of discrimination." *Id.* (citing *EEOC v. PVNF, LLC*, 487 F.3d 790, 800 (10th Cir. 2007)). If she establishes a prima facie case, the burden shifts to defendant to assert a legitimate, non-discriminatory reason for the adverse employment action. *Id.* If defendant meets this burden, summary judgment against plaintiff is warranted unless she introduces evidence "that the stated nondiscriminatory reason is merely a pretext for discriminatory intent." *Id.* (citing *Simmons v. Sykes Enters.*, 647 F.3d 943, 947 (10th Cir. 2011)).

---

[5] Plaintiff also includes in the pretrial order her claims based on workplace monitoring, Apria's refusal to permit her to rescind her resignation and Apria's failure to rehire her. The court, of course, omits these claims from the discussion at this point based on its lack of jurisdiction over those claims.

[6] The court applies the same standards and burdens to plaintiff's § 1981, KAAD and KADEA claims as it applies to plaintiff's Title VII and ADEA claims. *Crowe v. ADT Servs., Inc.*, 649 F.3d 1189, 1194 (10th Cir. 2011); *Carney v. City & County of Denver*, 534 F.3d 1269, 1273 (10th Cir. 2008); *Aramburu v. Boeing Co.*, 112 F.3d 1398, 1403 n. 3 (10th Cir. 1997).

*A.     Adverse Employment Actions*

In its motion for summary judgment, Apria contends that plaintiff cannot establish a prima facie case of discrimination with respect to her claims concerning training; the amount of phone work and other job duties assigned to her; her assigned work schedules; the application and enforcement of productivity goals; the application of Apria's attendance and leave policies; or her resignation because plaintiff cannot establish that she suffered an adverse employment action with respect to these issues.  An adverse employment action is a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."  *Id*. at 635. Because the uncontroverted evidence demonstrates that plaintiff did not suffer an adverse employment action with respect to these claims, summary judgment in favor of Apria is granted.

1.     Training

Plaintiff contends that she received limited training when she was hired by Apria and that the training she did receive was exclusively on-the-job training with other employees. Beginning in early 2010, new employees in the Customer Service Specialist department received more formal training—the training period itself was extended by several weeks and classroom training was added.  Plaintiff avers that she was never offered the opportunity to complete additional training after the formal training program was instituted.[7]  While plaintiff testified in her deposition that the training she received adequately prepared her for her position and that she learned what she needed to know to complete her job duties, plaintiff avers that she

---

[7] Plaintiff does not allege that she requested additional training but was denied that opportunity.

believes that if she had received additional training she would have been considered a more desirable candidate for purposes of promotion, transfer or pay increases. There is no objective evidence in the record supporting plaintiff's perception that her failure to obtain lengthier, formal training negatively affected her advancement opportunities. There is no evidence in the record that plaintiff was denied a specific position (or was deemed ineligible for any position whatsoever) because she did not possess the training that was subsequently offered to new hires after her start date. In the absence of such evidence, she cannot demonstrate that she suffered an adverse employment action based on her lack of additional training. *Compare Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1219 (10th Cir. 2013) (denial of training presumably would constitute an adverse employment action where lack of training undisputedly blocked plaintiff from applying for promotions; summary judgment affirmed in any event for failure to establish pretext) *with Tran v. Trustees of State Colleges in Colorado*, 355 F.3d 1263, 1268 (10th Cir. 2004) (employer's delay in providing plaintiff with additional training not an adverse employment action because delay did not "create an adverse change in her job responsibilities"); *see also Hadman v. Sebelius*, 2011 WL 4736972, at *5 (E.D.N.Y. Oct. 6, 2011) (denial of training, without a showing of some injury therefrom, cannot alone constitute an adverse employment action); *Belgasem v. Water Pik Tech., Inc.*, 457 F. Supp. 2d 1205, 1215 (D. Colo. 2006) (plaintiff could not show adverse action without evidence linking denied training to lack of promotion). Defendant is entitled to summary judgment on this claim.


2.     Additional Phone Work and Job Duties

Plaintiff avers that she and Ms. Dinkins were the primary employees assigned to answering the telephones in the Customer Service Specialist department and that non-African-American employees in the department were not required to answer the phones. She further avers that she was required to answer the phones during Apria's Christmas party in 2009. Plaintiff contends that she had additional duties that non-African-American employees were not required to perform in that she was asked to provide training to new hires in the department. Plaintiff, however, does not contend these additional duties (which fell within her job description) had any bearing on her employment status. She does not, for example, contend that these additional duties prevented her from accomplishing other tasks or from fulfilling her productivity goals (which, as indicated below, she routinely achieved) or had any other effect on her performance that might ultimately have changed her employment status. Analyzing similar facts, the Tenth Circuit has held that that an employer's assignment of certain, additional duties to only some employees holding the same position did not rise to the level of an adverse employment action. *See Piercy v. Maketa*, 480 F.3d 1192, 1204 n.13 (10th Cir. 2007); *see also Faragella v. Douglas County Sch. Dist. RE-1*, 411 Fed. Appx. 140, 155-56 (10th Cir. Jan. 12, 2011) (affirming district court's grant of summary judgment on plaintiff's claim that she was the only employee in her department given excessive copying assignments and a heavier caseload; no evidence such actions were adverse employment actions as opposed to inconveniences). Because Apria's assignment of additional duties to plaintiff does not constitute an adverse employment action, summary judgment on this claim is granted in favor of Apria.

3.    Assigned Work Schedules

Plaintiff contends that she was told at the time of her hire that her shift assignment was 10:30am to 7:00pm but that she could transfer to an earlier-starting shift based on seniority. As plaintiff understood it, then, people hired in the department subsequent to plaintiff's hiring would be assigned the 10:30am shift, permitting her to move to an earlier shift. Plaintiff contends that younger, non-African-American employees who started after plaintiff's start date (particularly Ms. Thompson) were given more desirable shifts such as 9:00am to 6:00pm. Despite her seniority and repeated assurances from Apria that she would receive a more desirable shift, plaintiff was not assigned a more desirable shift until July 2010.

Plaintiff directs the court to no evidence suggesting that her failure to obtain an earlier shift constitutes a "significant change in employment status or responsibilities." She offers no evidence that the 10:30am to 7:00pm shift was more difficult or involved different job duties. She does not contend that the shift to which she was assigned had any bearing on her job classification or salary. In fact, the uncontroverted evidence suggests only that plaintiff desired an earlier shift purely for personal reasons. Apria's failure to move plaintiff to an earlier shift, then, is not material. *See Daniels v. United Parcel Serv*., Inc., 701 F.3d 620, 635-36 (10th Cir. 2012) (assignment to night shift did not constitute adverse employment action); *McGowan v. City of Eufala*, 472 F.3d 736, 742-43 (10th Cir. 2006) (assignment to night shift as opposed to day shift did not constitute adverse employment action in absence of evidence that night shift was more arduous, had lower salary or otherwise differed significantly from day shift; denial of

transfer to day shift not material because employee desired day shift for personal reasons).[8] Summary judgment on this claim is granted.

4.      Productivity Goals

According to plaintiff, "company policy" required that employees in the Fax Data Entry department achieve a daily quota of 50 faxes and that department employees were required to complete a daily productivity log that recorded the number of faxes and other work performed. According to plaintiff, the Group Productivity Logs produced by Apria in this litigation confirm that, on a consistent basis, plaintiff was the "second highest performer" in Fax Data Entry and that Kelly Thompson routinely did not achieve the quota of 50 faxes. Based on alleged evidence that is largely inadmissible, plaintiff contends that Apria permitted Ms. Thompson to alter her entries on her productivity logs; turned a blind eye to Ms. Thompson's purported lack of productivity; and stopped distributing the productivity logs once plaintiff complained about the lack of productivity of other employees including Ms. Thompson.

Even assuming that Apria held plaintiff to a higher standard in terms of productivity than younger, non-African-America employees, she has not demonstrated that Apria's "blind eye" to other employees' slacking off constitutes an adverse employment action. *See Semsroth v. City of Wichita*, 304 F.ed Appx. 707, 718-19 (10th Cir. Dec. 22, 2008) (plaintiff did not demonstrate

---

[8] From time to time in her response, plaintiff states that certain actions on the part of Apria had an "adverse impact" on plaintiff and other older, African-American employees.  She has never asserted a discrimination claim based on an adverse impact theory (and obviously she cannot do so now) and, thus, the court construes plaintiff's use of this phrase to mean only that the actions had a negative or detrimental impact or effect on her employment for the purposes of attempting to establish an adverse employment action.

adverse employment action with respect to lack of disciplinary actions taken against other officers).  According to plaintiff, the fact that Apria retained Ms. Thompson in employment despite her lack of productivity had a detrimental effect on plaintiff's employment because Ms. Thompson then obtained a transfer when their jobs were outsourced.  While her argument is not entirely clear, plaintiff seems to suggest that Apria's decision to retain Ms. Thompson despite her alleged lack of productivity negatively impacted plaintiff's ability to obtain a transfer or promotion because she was left to compete with Ms. Thompson for available jobs.  But there is simply no evidence that plaintiff and Ms. Thompson were similarly situated in terms of their qualifications and experience such that they were competing for the same positions.  Moreover, plaintiff does not identify any specific position that she would have or should have obtained but for Ms. Thompson.  In fact, the evidence demonstrates that Ms. Thompson simply returned to EDI—the group for which she was initially hired—shortly after the outsourcing decision was made.  In the absence of such evidence, plaintiff has not shown that Apria's failure to discipline Ms. Thompson or to retain Ms. Thompson's employment constitutes an adverse employment action.  The court grants Apria's motion for summary judgment on this claim.

5.      Application of Attendance and Leave Policies

Plaintiff contends that Apria's attendance and leave policies were applied more restrictively to older, African-American employees than younger, Caucasian employees.  She avers than younger, Caucasian employees such as Ms. Thompson routinely violated Apria's attendance and leave policies without consequence but that plaintiff was threatened with discipline on one occasion regarding a request for time off and that her requests were not

approved in a timely fashion. Conceding that the manner in which Apria applied its attendance and leave policies to plaintiff did not affect her employment status, *see, e.g., DeWalt v. Meredith Corp*., 288 Fed. Appx. 484, 493 (10th Cir. July 31, 2008) (lack of response to request for vacation time did not constitute adverse employment action), plaintiff focuses again on the manner in which Apria applied those policies to Ms. Thompson and contends that plaintiff's employment was detrimentally affected because Ms. Thompson should have been terminated for her policy violations but instead was retained such that plaintiff had to compete with Ms. Thompson for available jobs after the outsourcing. For the same reasons described above in connection with plaintiff's claim concerning productivity goals, summary judgment is appropriate on this claim as well.

6.      Forcing Plaintiff's Resignation

Plaintiff contends that Apria forced her to resign her employment or, stated another way, effectively terminated her employment. Apria contends that plaintiff's resignation was entirely her decision and that Apria did not terminate the employment relationship such that Apria took no adverse employment action against her. *See Potts v. Davis County*, 551 F.3d 1188, 1194 (10th Cir. 2009) (to establish a constructive discharge, plaintiff must show that she had "no other choice but to quit"; no constructive discharge if a plaintiff resigns of her "own free will"). The court agrees that no reasonable jury, viewing the evidence in the light most favorable to plaintiff, could conclude that Apria terminated plaintiff's employment. Plaintiff admits that she declined the triage position because she was mad that, although the position came with an increase in pay, Ms. Thompson was still earning more per hour than plaintiff; that the position

required a "forced return" to a late shift of 10:00am to 7:00pm; and that the position was limited to triage. She admits that she submitted a resignation letter on February 21, 2011 after orally resigning her employment at the time she declined the triage position.

In such circumstances, plaintiff clearly resigned of her own free will. The evidence demonstrates nothing so undesirable or unfavorable about the position offered to plaintiff—a position that undisputedly involved an increase in pay—that Apria essentially forced her to choose between quitting and some detrimental change in her employment status. *DeWalt v. Meredith Corp.*, 288 Fed. Appx. 484, 494-95 (10th Cir. July 31, 2008) (no constructive discharge based on transfer to night shift even though plaintiff subjectively viewed transfer as a step down where pay and benefits were not reduced); *Vann v. Southwestern Bell Tel. Co.*, 179 Fed. Appx. 491 (10th Cir. May 3, 2006) (no constructive discharge despite transfer to another office location more than 150 miles away). Moreover, plaintiff has alleged no facts demonstrating that plaintiff's failure to obtain a subjectively more desirable position than the position offered to her is sufficient to render her resignation involuntary. *Green v. JP Morgan Chase Bank Nat. Ass'n*, 501 Fed. Appx. 727, 733 (10th Cir. Nov. 1, 2012) (no constructive discharge when plaintiff was denied promotion).

Because no reasonable jury could conclude that plaintiff was forced to resign, plaintiff cannot establish that she suffered an adverse employment action with respect to her resignation. Summary judgment on this claim is granted.

B.      *Discriminatory Pay Rate Claim*

Plaintiff asserts in the pretrial order that Apria discriminated against her on the basis of her race and/or age with respect to her hourly rate of pay as compared to younger, Caucasian employee Kelly Thompson. The court, then, analyzes whether Apria has met its burden to articulate a legitimate, nondiscriminatory reason for the employment decisions. [9] "This burden is one of production, not persuasion; it can involve no credibility assessment." *Carter v. Pathfinder Energy Servs., Inc.*, 662 F.3d 1134, 1149 (10th Cir. 2011) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000)). The Tenth Circuit has characterized this burden as "exceedingly light," and the court finds that Apria has carried it here. *See id.* According to Apria, it paid Kelly Thompson a higher rate of pay because she was hired into a higher-level position (Customer Quality Specialist in the EDI group) with a correspondingly higher pay scale and different job duties than plaintiff's position. Apria, then, asserts that plaintiff is not similarly situated to Ms. Thompson. *See Mickelson v. New York Life Ins. Co.*, 460 F.3d 1304, 1310 (10th Cir. 2006) ("Under Title VII, the plaintiff always bears the burden of proving that the employer intentionally paid her less than a similarly-situated . . . employee" outside the protected class). The burden of proof, then, shifts back to plaintiff to show that Apria's proffered reasons are pretextual.

Evidence of pretext "may take a variety of forms," including evidence tending to show "that the defendant's stated reason for the adverse employment action was false" and evidence tending to show "that the defendant acted contrary to a written company policy prescribing the

---

[9] Although Apria contends that plaintiff cannot establish a prima facie case with respect to these claims on the grounds that there are no "circumstances giving rise to an inference of discrimination," the court elects to consider this argument in connection with the pretext analysis to give plaintiff the full benefit of the *McDonnell Douglas* framework.

action to be taken by the defendant under the circumstances." *Carter v. Pathfinder Energy Servs., Inc.*, 662 F.3d 1134, 1150 (10th Cir. 2011) (quoting *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1230 (10th Cir. 2000)). A plaintiff may also show pretext with evidence that the defendant had "shifted rationales" or that it had treated similarly situated employees differently. *Crowe v. ADT Servs., Inc.*, 649 F.3d 1189, 1197 (10th Cir. 2011). In essence, a plaintiff shows pretext by presenting evidence of "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *McDonald–Cuba v. Santa Fe Protective Servs., Inc.*, 644 F.3d 1096, 1102 (10th Cir. 2011).

In an effort to show that Apria's argument is pretextual, plaintiff attempts to show that Ms. Thompson is, in fact, similarly situated to plaintiff such that Apria's decision to pay Ms. Thompson a higher wage is sufficient to permit a jury to infer discrimination. In support of this argument, plaintiff contends only that an August 2010 telephone directory of Apria employees reflects that Kelly Thompson was employed as a Customer Service Specialist and not as a Customer Quality Specialist. Apria acknowledges that fact. As explained by Apria, it hired Ms. Thompson as a Customer Quality Specialist in the EDI group in February 2010. Because Ms. Thompson initially struggled with the job duties of that position, Apria temporarily assigned Ms. Thompson to the FDE group in March 2010 so that she could learn Apria's customer service functions. In January 2011, Apria returned Ms. Thompson to her duties as a Customer Quality Specialist in the EDI group—the position for which she had been hired. The directory

highlighted by plaintiff, then, simply reflects Ms. Thompson's temporary assignment as a Customer Service Specialist in the FDE group.

Plaintiff purports to controvert these facts, arguing that Ms. Thompson's hourly rate should have been reduced commensurate with the Customer Service Specialist position in the FDE group when she was reassigned to that position. She further asserts that the reassignment was not temporary because it lasted for many months and, in any event, Ms. Thompson never was able to learn Apria's customer service functions. But plaintiff has no evidence suggesting that Apria violated its own policies or practices by declining to reduce Ms. Thompson's pay rate when it reassigned her or that Apria did not genuinely believe that the assignment was temporary and that she sufficiently learned the customer service functions to bring her back to the CQS position in the EDI group in early 2011. Plaintiff's subjective beliefs about Apria's intentions or Ms. Thompson's abilities simply have no bearing on the issue.

There is no competent evidence, then, supporting the conclusion that Ms. Thompson is similarly situated to plaintiff for purposes of plaintiff's discriminatory pay rate claim. Rather, the evidence reflects that the only employees who are similarly situated to plaintiff are those employees who held the same job as plaintiff—Peggy Dinkins; Melody Kemper; and Sarah Jenkins, the three other full-time, permanent Customer Service Specialists in the FDE group. A comparison of the pay rates of these employees is fatal to plaintiff's claim. Plaintiff was hired in October 2009 at an hourly rate of $13.50 and retained this pay rate until the end of her employment, having declined a promotion to $14.87 per hour. Peggy Dinkins, also African-American and the same age as plaintiff, was hired in December 2009 at an hourly rate of $13.90 and she retained this rate of pay after she transferred to her post-outsourcing position. Melody

Kemper and Sarah Jenkins, both Caucasian, were both hired in July 2010 at a rate of $13.16 and they retained this rate of pay until they accepted post-outsourcing promotions in early 2011 to the Customer Quality Service position. Ms. Kemper is ten years older than plaintiff; Ms. Jenkins is significantly younger than plaintiff.

Quite clearly, then, the only similarly situated employee who was treated more favorably than plaintiff was an African-American employee who was the same age as plaintiff. Because the uncontroverted facts would not permit a reasonable jury to draw any inference of race- or age-based discrimination concerning plaintiff's rate of pay, summary judgment in favor of Apria is granted on this claim.[10]


C.     *Discriminatory Failure-to-Transfer or –Promote Claims*

According to plaintiff, Apria discriminated against her on the basis or her race and/or age when it failed to transfer or promote her to any of 14 specific positions for which she applied and was qualified. Apria has articulated legitimate, non-discriminatory reasons for each of its

---

[10] In her statement of facts (but not in the argument portion of her brief) plaintiff states that Ms. Dinkins asked Tammy Hull, a Human Resources manager, about the pay disparity between Ms. Thompson on the one hand and plaintiff and Ms. Dinkins on the other hand. According to Ms. Dinkins' affidavit, Ms. Hull simply answered "Maybe she knows someone" and never justified the disparity by claiming that Ms. Thompson was a Customer Quality Specialist at a higher pay scale. Ms. Dinkins further avers that she asked certain supervisors about the pay disparity and that none of these individuals ever justified the disparity by asserting that Ms. Thompson was a Customer Quality Specialist. To the extent plaintiff suggests that Apria's current explanation is pretextual because that explanation was not given at the time Ms. Dinkins' inquired about the disparity, the court is not persuaded in the absence of evidence that Apria gave inconsistent explanations about the disparity. ); *Twigg v. Hawker Beechcraft Corp.*, 659 F.3d 987, 1002 (10th Cir. 2011) (changing explanations can show that the employer is attempting to mask an illegitimate motive). Indeed, Ms. Dinkins' affidavit suggests only that Ms. Hull and others were simply avoiding Ms. Dinkins's question (which is not surprising given that Ms. Dinkins arguably was not entitled to an answer).

hiring decisions and, in turn, plaintiff attempts to show that those reasons are pretextual. As will be explained, no reasonable jury viewing the evidence in the light most favorable to plaintiff could conclude that Apria's explanations for its transfer and promotion decisions were pretextual or otherwise based on plaintiff's race and/or age.

1.      Apria Cancelled the Requisition for Three Jobs

With respect to three of the 14 positions for which plaintiff applied, Apria asserts that it did not hire anyone for the positions because it cancelled the requisitions due to business reasons. These positions are the Billing Representative IV position (Job #05209); the Payor Change Coordinator position (Job #07654); and the Customer Quality Specialist position (Job #12016). Plaintiff does not controvert these facts at all. She asserts only that she was qualified for the positions and should have been hired—her standard response to Apria's explanations for each of the transfer/promotion decisions. Of course, the fact that plaintiff was qualified and her belief that she should have been hired do not remotely call into question Apria's non-discriminatory reason for failing to hire plaintiff for these positions. She offers no evidence and does not suggest that these positions were, in fact, filled by other candidates or that Apria did not cancel the requisitions. Summary judgment on these claims, then, is granted.[11]

2.      Billing Representative Position (Job #10655)

[11] Although Apria did not frame its argument in this way, summary judgment on these claims is also appropriate in light of plaintiff's failure to establish a prima facie case. *See Jaramillo v. Colo. Judicial Dep't*, 427 F.3d 1303, 1306-07 (10th Cir. 2005) (failure-to-transfer or –promote claim requires a showing that the position was filled or remained open).

With respect to the Billing Representative position for which plaintiff applied, Apria asserts that plaintiff's resume did not reflect that she had experience with medical billing and that the successful candidate had more than 10 years' experience in medical billing. Apria also highlights that the successful candidate is African-American and older than plaintiff. The fact that the position was filled by a person who is older than plaintiff is fatal to her ADEA claim. *See Rivera v. City & County of Denver*, 365 F.3d 912, 920 (10th Cir. 2004).[12] Plaintiff does not dispute that the successful candidate was qualified for the position and does not even dispute that the successful candidate was more qualified than plaintiff with respect to medical billing. She simply reiterates that she was qualified for the position and further suggests that she should have received preference over other candidates because her position was outsourced. Apria, however, never suggested to plaintiff that she would receive preferential treatment with respect to transfers or promotions; at the most, it promised to find her another position (which, of course, it did). And the law does not require that employers give employees within a protected class preferential treatment in transfer and promotion decisions. Because she has not shown that Apria's hiring decision with respect to the Billing Representative position is pretextual, summary judgment is granted in favor of Apria as to plaintiff's claims concerning this position.

3.      Suspended Billing Representative Positions (Job #07726 and #10487)

Plaintiff applied for two Suspended Billing Representative positions. With respect to the first position, Job #07726, Apria contends that the successful candidate had "significant"

---

[12]   For this same reason, the court grants summary judgment on plaintiff's ADEA claims with respect to the Billing Center Quality Specialist position (Job #07724) as it is undisputed that the successful candidate was 15 years older than plaintiff.

experience in Suspended Billing as compared to plaintiff's limited exposure to Suspended Billing after Apria made the decision to outsource its FDE functions. Plaintiff contends, in turn, that her Suspended Billing experience was not "limited" in that she worked in that department for 5 months. But she has not shown that she was clearly more qualified than the successful candidate and, even assuming that she was just as qualified as the successful candidate, that fact does not establish pretext. *See Simms v. Okla. ex rel. Dep't Mental Health and Substance Abuse Servs.*, 165 F.3d 1321, 1330 (10th Cir. 1999) ("When two candidates are equally qualified in that they both possess the objective qualifications for the position and neither is clearly better qualified, it is within the employer's discretion to choose among them so long as the decision is not based on unlawful criteria." (quotation omitted)). Plaintiff has come forward with no evidence, then, calling into question Apria's hiring decision with respect to this position.

With respect to the second position, Job #10487, Apria has come forward with evidence that it received 243 applications for the position and that it hired 32 individuals for the position. Apria's evidence reflects that 16 of the 32 successful candidates are African-American and 15 of the successful candidates are similarly aged as or older than plaintiff. Apria contends that it selected those individuals whose qualifications best matched the job description for the position. Again, plaintiff contends only that she has 5-months' experience in Suspended Billing and that she should have received one of the positions because Apria outsourced her position, entitling her to preferential treatment in the process. For the reasons explained previously, plaintiff has not shown pretext with respect to these position.


4.      Customer Quality Specialist Position (Job #09065)

Plaintiff applied for the Customer Quality Specialist—CIC EDI/Initial Authorizations position but, according to Apria, was considered instead for the same position under a different requisition—Job #09738. Apria contends that the position under Job #09738 had the same title, job functions and hiring manager as Job #09065. Ultimately, Apria offered plaintiff a promotion (which she declined) under Job #09738 to the Customer Quality Specialist—CIC EDI/Initial Authorizations position with a raise to $14.87 per hour. In response to Apria's statement of facts, plaintiff does not controvert that she was offered a position with the same job title and duties as Job #09065. In her affidavit, however, she avers that the job she was offered was different than the one for which she applied because it was a "triage" position. Regardless, she does not come forward with any evidence, even assuming that the job duties between the jobs varied, that any offer she might have received under Job #09065 would have included a higher rate of pay or a better schedule than the position she was offered and declined. Apria also asserts that the individual hired for Job #09065 was already performing the same role and meeting Apria's expectations. Plaintiff does not have any evidence converting this fact or otherwise suggesting that the successful candidate was somehow less qualified than plaintiff for the position. In the absence of any evidence suggesting that Apria's explanation for this hiring decision is unworthy of belief, the court grants summary judgment in favor of Apria with respect to this position.

5.    Remaining Positions

The remaining positions for which plaintiff applied include a Billing Center Quality Specialist position (Job #07724); an Acquisition Specialist position (Job #06187); two Payor

Change Coordinator positions (Job #09159 and Job #12082); a Collections Representative position (Job #09943); a Medical Billing and Collections Representative position (Job #10689); and a Customer Quality Specialist (Job #10646). The parties' arguments with respect to these positions are strikingly similar to the arguments stated with respect to the other positions. Apria contends that it selected successful candidates based on those individuals' qualifications in light of the job descriptions for the position; and that those hiring decisions include numerous successful African-American and older individuals. Plaintiff contends that she "should have been hired" based on her own qualifications and that she should have received preferential hiring treatment. But plaintiff does not challenge any specific hiring decision or contend that any particular candidate was not qualified for the position and she does not contend that she was more qualified than the successful candidates. Neither does she otherwise call into question Apria's hiring decisions.

Plaintiff has not shown that Apria's explanations with respect to any of these decisions are pretextual. Moreover, Apria's evidence shows that it hired numerous African-American and older individuals for these positions. For example, Apria hired 17 individuals (out of 302 applicants) for Job #12082; 11 of those individuals are African-American and 5 are similarly aged as or older than plaintiff. Apria hired 38 individuals (out of 218 applicants) for Job #10689; 12 of those individuals are African-American and 16 are similarly aged as or older than plaintiff. It hired 29 individuals (out of more than 500 applicants) for Job #10646; 13 of those individuals are African-American and 11 are similarly aged as or older than plaintiff. It hired 6 individuals (out of 307 applicants) for Job #09943 and 3 of those individuals were similarly aged as or older than plaintiff. The successful candidate for Job #06187 was only two years

younger than plaintiff and had over 20 years' experience at Apria. In the face of such evidence, and in the absence of evidence from which a jury could conclude that Apria failed to select plaintiff for one or more of these positions based on her race or age, the court grants summary judgment in favor of Apria on these claims.[13]

## V. Retaliation Claims

Both Title VII and the ADEA make it unlawful for an employer to retaliate against an employee because he or she has opposed any practice made an unlawful employment practice by those statutes. 42 U.S.C. § 2000e–3(a)); 29 U.S.C. § 623. As with plaintiff's other Title VII and ADEA claims, the court assesses her retaliation claims under the *McDonnell Douglas* framework. *Daniels v. United Parcel Serv., Inc.*, 701 F.3d 620, 638 (10th Cir. 2012). To state a prima facie case for retaliation, plaintiff "must show (1) she engaged in protected opposition to discrimination, (2) a reasonable employee would have considered the challenged employment action materially adverse, and (3) a causal connection existed between the protected activity and the materially adverse action." *Id*. (quoting *Hinds v. Sprint/United Mgmt. Co.*, 523 F.3d 1187, 1202 (10th Cir. 2008)).

Apria does not contest, of course, that plaintiff engaged in protected activity when she submitted her numerous filings with the EEOC and the KHRC and the record does not reflect

---

[13] To the extent plaintiff contends that she and Ms. Dinkins, based on their race and/or age, were the last members of the FDE group to receive an offer, the uncontroverted facts do not support this assertion. Plaintiff's own facts demonstrate that Melody Kemper had a follow-up interview on February 16, 2011—the same day that plaintiff was offered a position.

that she engaged in any other protected activity.[14]  Nonetheless, Apria contends that plaintiff

cannot establish a prima facie case of retaliation because no causal connection exists between

plaintiff's agency filings and any materially adverse action identified by plaintiff.  More

specifically, Apria contends that the only people with knowledge of plaintiff's protected

activities undisputedly did not participate in any decisions concerning plaintiff's rate of pay, or

her applications for other positions within Apria.[15]  In that regard, Tamera Hull, Apria's Human

Resources manager at the Sprint Campus location, avers that she is the individual who first

received each of the charges and amendments filed by plaintiff.  According to Ms. Hull, she

notified only two individuals about plaintiff's charges—John Moore (Vice President, Customer

Care Center) and Jeffrey Dappen (Area Operations Manager).  Ms. Hull further avers that she

was not a decisionmaker with respect to plaintiff's rate of pay or any of the positions for which

plaintiff applied.  Similarly, Mr. Moore and Mr. Dappen both aver that they were not decision

makers with respect to plaintiff's rate of pay or any of the positions for which plaintiff applied

---

[14] While there is evidence that plaintiff complained to members of management about generalized unfair treatment between and among employees in her department (such as the fact that Sarah Jenkins allegedly received a transfer to another department despite having worked in her previous position for only 5 months and had missed several days of work), there is no evidence in the record that plaintiff complained to or otherwise notified any member of Apria management that she felt subjected to race- or age-based discrimination or retaliation in the workplace.

[15] While plaintiff identifies other actions in the pretrial order that were allegedly retaliatory, these actions are either not materially adverse for the reasons set forth in connection with plaintiff's discrimination claims concerning those same actions (*i.e.*, lack of training; her shift assignment; increased phone work and other job duties; inconsistent enforcement of productivity goals and attendance/leave policies; forced resignation) or have been dismissed based on plaintiff's failure to exhaust her administrative remedies with respect to those actions (*i.e.*, increased workplace monitoring; Apria's refusal to permit plaintiff to rescind her resignation and its failure to rehire plaintiff).

and, significantly, that they did not discuss the fact or nature of plaintiff's filings with anyone other than Ms. Hull.[16]

According to plaintiff, the evidence, when viewed in her favor, shows that other managers may have known about her charges because she felt subjected to heightened scrutiny by certain managers after she filed her charges; other employees in her department were physically moved away from plaintiff's workspace after she filed her charges; and she and Ms. Dinkins were the only employees not notified of a fire drill and were the only employees left in the building during the drill.[17]    No reasonable jury could conclude from this evidence that any relevant decision-maker had knowledge of plaintiff's protected activity.  Putting aside the fact that any link between these actions and knowledge of plaintiff's charges is entirely speculative, plaintiff points to no evidence or even suggests that any of the managers who allegedly increased their scrutiny of plaintiff or moved plaintiff's co-workers away from her participated in any of the decisions concerning her rate of pay or the positions to which she applied.  Plaintiff also suggests that because the envelopes used to transmit her charges to Apria were not

---

[16] Mr. Dappen avers that he was a decisionmaker with respect to implementation of a formal pay structure for customer service employees but that he did not make any employment decisions, including pay rate decisions, specifically related to plaintiff.  Mr. Dappen further avers that he was involved in Apria's decision to outsource the functions of the FDE department to a third-party vendor.  The court, however, does not read the pretrial order to assert a retaliation claim based on the outsourcing decision and neither party addresses such a claim in their submissions.  To the extent plaintiff intends to assert such a claim, the court concludes that there is no evidence remotely suggesting that Apria decided to outsource the FDE department's functions to a third-party vendor in India because of plaintiff's agency filings (or, for that matter, based on plaintiff's age or race).

[17] Curiously, the incident concerning the fire drill occurred in July or August 2010—undisputedly before plaintiff even filed her first charge.  Plaintiff's suggestion, then, that this incident proves that people in the office knew about her charge is meritless.

addressed to Ms. Hull specifically but were addressed only to Apria, someone else may have seen her charges prior to Ms. Hull. Again, this speculative suggestion does not establish that a decisionmaker had knowledge of plaintiff's charge.

In the end, the affidavits of Ms. Hull, Mr. Moore and Mr. Dappen are uncontested as to critical facts—they alone had knowledge of plaintiff's protected activity and did not share that information with anyone and they did not participate in any of the challenged employment decision. Plaintiff declined the opportunity to depose any management employees of Apria and she has not otherwise uncovered any evidence indicating that the affidavits of Ms. Hull, Mr. Moore or Mr. Dappen are unworthy of belief or that any decisionmaker had knowledge of her protected activity.[18] Because plaintiff has not come forward with any evidence that any person involved in the challenged employment decisions had any knowledge whatsoever of her protected activity, summary judgment in favor of Apria is appropriate on plaintiff's retaliation claims. *See Hinds*, 523 F.3d at 1203-04 (summary judgment appropriate on retaliation claim where plaintiff had no facts showing that anyone involved in his termination had knowledge of

---

[18] In her affidavit, plaintiff avers that she had a conversation in January 2011 with Gratia Carver, a management employee, and that Ms. Carver said that she "didn't understand how someone could miss 21 days and hadn't been written up," presumably referencing either Ms. Jenkins or Ms. Thompson. According to plaintiff, "that was something [Ms. Carver] could only have known about" if she had seen plaintiff's EEOC charge or Ms. Dinkins' EEOC charge. No reasonable jury could conclude based on this evidence that Ms. Carver (or other management employees) had knowledge of plaintiff's EEOC activity. Nothing in plaintiff's charges or amendments reflects a specific reference to excessive absenteeism by Ms. Thompson or Ms. Jenkins. Moreover, as a manager, Ms. Carver would have had access to the personnel files and attendance records of Ms. Thompson and Ms. Jenkins.

protected activity; uncontested evidence established that HR manager received complaint, did not share it with anyone else, and did not participate in termination decision).[19]


      **IT IS THEREFORE ORDERED BY THE COURT THAT** defendant Apria Healthcare, Inc.'s motion to dismiss and for summary judgment (doc. 34) is **granted.**  The court also dismisses with prejudice all claims against Apria Healthcare Group, Inc.


      **IT IS SO ORDERED.**


      Dated this 17th day of July, 2013, at Kansas City, Kansas.


                           s/ John W. Lungstrum
                           John W. Lungstrum
                           United States District Judge

---

[19] Because the court concludes that plaintiff has not established the requisite causal connection, it declines to address Apria's remaining arguments concerning plaintiff's retaliation claims.